| | | |
|---|---|---|
| **CAL-TENN FINANCIAL, LLC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-01347** |
| | ) | **Judge Aleta A. Trauger** |
| **SCOPE AUTOMOTIVE, LLC,** | ) | |
| **WILLIAM BECKER, GEORGE BRYAN,** | ) | |
| **ADAM SALDANA, CARE AUTO GROUP,** | ) | |
| **and EDGAR SOLIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 14) filed by the defendants, Scope Automotive, LLC ("Scope"), William Becker, George Bryan, Adam Saldana, Care Auto Group ("CAG"), and Edgar Solis, to which the plaintiff, Cal-Tenn Financial, LLC ("Cal-Tenn"), has filed a Response (Docket No. 21), and the defendants have filed a Reply (Docket No. 22). For the reasons discussed herein, the defendants' motion will be granted in part.

## BACKGROUND

This case involves the sale and servicing of consumer automotive loans, as well as the handling of the motor vehicles underlying those loans. Scope is a used automobile dealership with multiple locations in Texas. Scope purchases, sells, finances, services, and repossesses used automobiles. Saldana, Becker, and Bryan own and operate Scope. They are referred to herein as the "Scope Principals", and all actions attributed in this memorandum to Scope are likewise attributed to them. CAG is a Texas business owned and operated by Solis. CAG assists Scope with its business activities in a variety of ways. CAG finances vehicles purchased by Scope for sale to consumers, performs services on Scope's inventory, performs collection activities for

Scope, handles repossessions for Scope, reconditions Scope's vehicles, and takes Scope's vehicles to auction. Cal-Tenn is a third-party service provider that primarily services loans on automobiles in Nashville, Tennessee. Cal-Tenn also purchases and resells individual loans from automobile dealers.

Scope finances many of its customers' vehicle purchases. It thus owns portfolios of auto loans that require servicing. Scope sometimes sells these portfolios to third party providers such as Cal-Tenn. To that end, Scope entered into a business arrangement with Cal-Tenn in 2015. Under the arrangement, Scope sold Cal-Tenn original loan documents such as titles, retail installment contracts, credit histories, and credit applications. These documents were occasionally hand-delivered by the Scope Principals to Cal-Tenn in Tennessee.

## I.    Purchase Agreement

The parties operated under various formal sales agreements. On March 22, 2017, Cal-Tenn entered into a Dealer Master Purchase Agreement ("Purchase Agreement") with Scope and the Scope Principals. The Purchase Agreement maintained the relationship's status quo: Cal-Tenn purchased Scope's interests in certain "receivables"—including retail installment contracts, liens, loans, and insurance claims—and in related assets—including vehicles, titles, security interests, and collateral. Over the term of the Purchase Agreement, Cal-Tenn purchased over $1.2 million dollars in receivables from Scope. The Purchase Agreement defines Cal-Tenn as the "Purchaser" and Scope and the Scope Principals as, collectively, the "Seller." The signatories to the Purchase Agreement are Cal-Tenn, Scope (through Saldana as COO), Becker, and Bryan. The Purchase Agreement includes the following provision governing choice of venue:

> VENUE: Choice of jurisdiction and venue is the prerogative of the Purchaser. Seller submits to the jurisdiction chosen by Purchaser. Purchaser may select Tennessee law, laws of the State where bulk of damages occurred or Federal law if Federal jurisdiction is appropriate.

(Docket No. 1-3 at 32.)

Upon purchase of any loan from Scope, Cal-Tenn was given power of attorney for all rights in the underlying automobiles. The Purchase Agreement required Scope to send the vehicles' original titles to Cal-Tenn. Scope was to complete the necessary application for Cal-Tenn to be the first lienholder on the titles; Scope would remain as the second lienholder to facilitate repossessions, insurance claims, and storage issues. If a consumer defaulted on a loan owned by Cal-Tenn, certain procedures governed how Scope would handle the underlying vehicle, its repossession, and the requisite payments to Cal-Tenn. For involuntary repossessions, Cal-Tenn would contract with a third-party, initiate the recovery authorizations, and notify the consumer of the repossession and intent to sell. For voluntary repossessions, Scope was to notify Cal-Tenn within 24 hours of a vehicle's delivery to a Scope dealership, so that the proper foreclosure notifications could be made. If a vehicle was involuntarily repossessed, Cal-Tenn was to be notified and the vehicle was to be returned to Scope or taken to a local auction for public sale. If the consumer defaulted on the loan within the payment recourse period ("buyback period"), Scope was to pay Cal-Tenn the current principal balance on the vehicle minus the discount percentage of the consumer's contract. Scope was obligated to pay full value on defaults during the buyback period, even if Scope did not want to keep the vehicle for resale.

If the consumer defaulted after the buyback period lapsed, Scope had the option to purchase the vehicle back from Cal-Tenn. If it wanted to resell the vehicle, Scope was to make a "bid" at an agreed-upon price, which was supposed to represent the fair market value of the vehicle in its current condition. Cal-Tenn would then either accept or reject the bid. If Cal-Tenn accepted the bid, Scope was required to send Cal-Tenn a check for the agreed-upon price. Upon receipt of the check, Cal-Tenn would send the original contract and title to Scope, thereby completing the

transaction. If Cal-Tenn accepted a bid that was less than the balance of the loan on that vehicle, Cal-Tenn would charge off any remaining balance on the loan. If Scope did not wish to keep the vehicle, Cal-Tenn would take it to an auction for public sale. These procedures presumed that Scope would make a fair and accurate assessment of the condition of a repossessed vehicle and submit a bid for the vehicle's true worth. Because the parties operated in different states, Cal-Tenn was not positioned to self-assess the vehicle's value, other than to utilize the available market data as to the vehicle's purported condition. Scope was expected to tender payment on an accepted bid or upon learning that it was a buyback.

## II. Servicing Agreement

On April 12, 2018, Cal-Tenn entered into a Servicing Agreement with Scope to service the remaining loans that Scope had not sold to Cal-Tenn under the Purchase Agreement. Scope and Cal-Tenn are signatories to the Servicing Agreement, under which Cal-Tenn was responsible for collections and related services on Scope's entire loan portfolio. Section 6.07 of the Servicing Agreement provides:

"Governing Law, Consent to Jurisdiction":

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS.

(b) BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TENNESSEE SITTING IN DAVIDSON COUNTY AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE PERFORMANCE OF THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH TENNESSEE STATE OR, TO THE EXTENT

PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE
PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH
ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE
ENFORCED IN OTHER JURISDICTIONs BY SUIT ON THE JUDGMENT OR
IN ANY OTHER MANNER PROVIDED BY LAW.

(Docket No. 1-3 at 44.)

### III.    Operative facts underlying Cal-Tenn's causes of action[1]

Cal-Tenn brings claims against Scope and the Scope Principals for breach of contract,

fraud, fraud in the inducement, and violation of the Tennessee Consumer Protection Act

("TCPA"). The facts underlying these causes of action are best understood in two categories: those

emanating from the parties' dealings under the Purchase Agreement, and those emanating from

the parties' dealings under the Servicing Agreement. As related to the Purchase Agreement, Cal-

Tenn alleges that: Scope did not have possession of many vehicles' original titles when they sold

those vehicles to consumers; Scope failed to tender payment to Cal-Tenn within the time

prescribed or, on some occasions, at all; Scope submitted fraudulent, forged, and/or bogus retail

installment contracts to Cal-Tenn; the defendants collectively falsified or directed others to falsify

credit applications, paystubs, and other consumer credit documents, which Scope submitted to Cal-

Tenn; the defendants collectively tampered with and altered copies of one or more consumer's

Texas driver's licenses or directed others to do so in order to sell vehicles and submitted these

fraudulent documents to Cal-Tenn to secure funding for the consumer; Scope double pledged

vehicles without proper disclosures; Scope obtained falsified Texas inspection reports by paying

an inspector $100 per vehicle so that vehicles could be sold and funded; to avoid having to pay

Cal-Tenn the full value during buyback periods, Scope posted consumer payments into accounts

when those payments were not made; Scope accepted payments without posting the payments,

---

[1] All facts recounted in this section are drawn from Cal-Tenn's Complaint. (Docket No. 1-3.)

5

crediting the consumer account, or notifying Cal-Tenn; the defendants collectively denied Cal-Tenn access to vehicles owned by Cal-Tenn, causing the vehicles to devalue; Scope failed to maintain all required licenses to sell, finance, or collect on motor vehicles in Texas, as required by Texas law, and; Scope owes over $400,000 in taxes to Tarrant County, Texas and has not filed its annual Vehicle Inventory Tax forms. In all, Cal-Tenn contends that Scope owes it approximately $933,000 for the repurchase of the vehicles covered by the Purchase Agreement.

Cal-Tenn alleges the following additional facts related to the Servicing Agreement: Scope has failed to pay fees owed to Cal-Tenn for work performed on Scope's loan portfolio; Scope misrepresented to Cal-Tenn that there were 1800 collectible accounts in the portfolio, when in fact there were only about 300; Scope did not maintain a bank account that Cal-Tenn could access; Scope did not keep proper accounting records, which hindered Cal-Tenn's ability to service the loans in Scope's portfolio; and, Scope denied Cal-Tenn access to their software system, preventing Cal-Tenn from performing under the contract and complying with reporting and other administrative requirements.

In addition, Cal-Tenn brings causes of action against all of the defendants for conversion and interference with contract. Cal-Tenn alleges that Scope instructed Solis and CAG to contact two companies with whom Cal-Tenn had contractual relationships. The first, 4-Wheel Towing, is a repossession company with whom Cal-Tenn contracted for towing services. The second, Alliance Auto Auction, is a Dallas auction company with whom Cal-Tenn contracted to sell vehicles that it repossessed as part of its arrangement with Scope. Cal-Tenn alleges that, at Scope's behest, Solis told 4-Wheel Towing not to release to Cal-Tenn any of the vehicles repossessed by Cal-Tenn. Cal-Tenn further alleges that, under Scope's direction, Solis and CAG took vehicles

repossessed by Cal-Tenn and/or Scope and told Alliance Auto Auction not to pay Cal-Tenn for those vehicles.

### IV. Dual litigation

On July 26, 2018, Scope filed a lawsuit against Cal-Tenn in Texas state court, alleging fraudulent inducement, breach of contract, breach of fiduciary duty, conversion, and theft. Scope requested a temporary restraining order ("TRO") and permanent injunction. On July 30, 2018, Scope's request for a TRO was denied without a hearing. On August 20, 2018, Cal-Tenn moved to dismiss Scope's Texas case for lack of jurisdiction. Cal-Tenn submitted an affidavit of its managing member, Tracy McMurtry, indicating that it was choosing Tennessee as the venue and jurisdiction for the lawsuit. On August 30, 2018, the state court held a hearing with regard to the preliminary relief sought by Scope. The court declined to rule on the issue until a jurisdictional determination had been made. On October 25, 2018, the court heard argument on Cal-Tenn's motion to dismiss and had both parties submit proposed orders. Later that day, the state court denied Cal-Tenn's motion. The court issued an order providing no explanation, analysis, or reasoning for its denial. The Texas case is currently scheduled for trial on June 4, 2019.

On October 25, 2018—the same day the Texas state court heard argument on, and subsequently denied, Cal-Tenn's motion to dismiss—Cal-Tenn filed its Complaint in this case in Tennessee state court. On December 5, 2018, the defendants removed the case to this court based on diversity. On December 21, 2018, the defendants filed their motion to dismiss. They seek dismissal on two grounds: first, that the court lacks personal jurisdiction over any of the defendants, and, second, that even if the court has personal jurisdiction over some or all of the defendants, it should decline to hear the case under the *Colorado River* abstention doctrine.

**LEGAL STANDARD**

The Sixth Circuit has set forth a well-defined procedural design aimed at guiding district courts in their disposal of Fed. R. Civ. P. 12(b)(2) motions for lack of personal jurisdiction. *Dean v. Motel 6 Operating, L.P.*, 134 F.3d 1269, 1271–72 (6th Cir. 1998). Cal-Tenn, as the party seeking assertion of personal jurisdiction, bears the burden of showing that personal jurisdiction exists. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991); *see also CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261–62 (6th Cir. 1996). To do so, Cal-Tenn may not simply rely on the allegations set forth in the complaint but must, by affidavit or otherwise, set forth specific facts showing the existence of jurisdiction. *Theunissen*, 935 F.3d at 1458.

In considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the court has three options. It may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). It is in the court's discretion, based on the circumstances of the case, which path to choose. *Id*. Where, as here, the moving party has submitted an affidavit and the parties have requested a decision on that basis, it is appropriate for the court to decide the jurisdictional issue based on the affidavit presented. *Theunissen*, 935 F.2d at 1458. In the absence of an evidentiary hearing on the issue, the court must consider the pleadings and affidavit in the light most favorable to the nonmoving party—here, Cal-Tenn. *Id*. at 1458–59. To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. *Id*. "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction." *Id*.; *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d

8

357, 360–61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

**ANALYSIS**

The court will address the defendants' arguments in turn.

## I.      Personal jurisdiction

It is well established that federal courts follow state law to determine the bounds of personal jurisdiction over a defendant. "For specific jurisdiction to exist in a diversity case, two factors must be satisfied: the forum state long-arm statute, and constitutional due process." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012); *see also Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003). Tennessee statutes authorize the exercise of jurisdiction over nonresident defendants on "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. §§ 20-2-214(a), 225(2). These statutes have been construed to expand the jurisdictional reach of Tennessee courts "as far as constitutionally permissible." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 384 (Tenn. 2015), *cert. denied sub nom. Fitch Ratings, Inc. v. First Cmty. Bank, N.A.*, 136 S. Ct. 2511 (2016). Thus, the federal and Tennessee minimum contacts analysis merge into a federal due process analysis because Tennessee's long-arm statute reaches to federal constitutional limits. The question here is whether this court's exercise of jurisdiction over the defendants would "comport[ ] with the limits imposed by federal due process." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, that defendant must have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326

9

U.S. 310, 316 (1945)). Cal-Tenn presents two ways in which the defendants have sufficient minimum contacts with Tennessee to support jurisdiction: first, via the choice of law and venue provisions in the Purchase Agreement and Servicing Agreement and, second, through the defendants' business activities in, or directed toward, Tennessee.

### A. Forum selection clauses

The minimum contacts standard can be met by a forum selection clause that is "freely negotiated" and is not "unreasonable and unjust." *M/S Bremen v. Zapata Off–Shore Co*., 407 U.S. 1, 10 (1972). The Sixth Circuit has explained that "the requirement that a court may have personal jurisdiction over a party is a waivable right and there are a variety of legal arrangements whereby litigants may consent to the personal jurisdiction of a particular court system." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2009) (emphasis added); *see also Air 1, Inc. v. Bizjet Int'l Sales & Support, Inc*., No. 07–0146, 2007 WL 1850002, at *5 (M.D. Tenn. June 25, 2007) (Echols, J.). One such legal arrangement is a forum selection clause that permits contracting parties to "agree in advance to submit to the jurisdiction of a particular court." *Preferred Capital*, 453 F.3d at 721 (citing *Zapata*, 407 U.S. at 10).

As a general rule, a forum selection clause is prima facie valid and is enforceable unless it is shown to be unfair or unreasonable. *Zapata*, 407 U.S. at 10; *see Wong v. PartyGaming Ltd*., 589 F.3d 821, 828 (6th Cir. 2009) (a "forum selection clause should be upheld absent a strong showing that it should be set aside") (citing *Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991)); *Security Watch, Inc. v. Sentinel Sys., Inc*., 176 F.3d 369, 375 (6th Cir. 1999). In order for a forum selection provision to be unreasonable and unjust, the moving party must show that the contractual forum is "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Zapata*, 407 U.S. at 18. Tennessee law is consistent with the rule of *Zapata*.

*See Dyersburg Machine Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W.2d 378, 383 (Tenn. 1983) (holding that courts of Tennessee "should enforce [a forum selection] clause unless the party opposing enforcement demonstrates that it would be unfair and inequitable to do so.").

### 1. Scope and the Scope Principals

Scope and the Scope Principals are signatories to the Purchase Agreement and therefore bound by its forum selection clause.[2] (Docket No. 1-3 at 32.) Scope is a signatory to the Servicing Agreement and is thus bound by its forum selection clause. (*Id.* at 48.) The defendants make several arguments in an attempt to limit the forum selection clauses' scope. They first argue that the Purchase Agreement clause does not mandate litigation in Tennessee because it is not forum-specific, meaning that it does not specify a state for venue. This is true. The clause states: "Choice of jurisdiction and venue is the prerogative of the Purchaser. Seller submits to the jurisdiction chosen by Purchaser." (*Id.*) Cal-Tenn is not required to litigate in Tennessee, but the Purchase Agreement clause clearly grants it authority to litigate wherever it chooses. Cal-Tenn chose Tennessee. The Purchase Agreement's lack of further specificity is irrelevant. The defendants make a similarly unavailing argument with regard to the Servicing Agreement clause. That clause reads in relevant part: "THE PARTIES HERETO HEREBY IRREVOCABLY AND

---

[2] In their Memorandum in support of their Motion to Dismiss, the defendants argue that Scope is not a signatory to the Purchase Agreement because only the Scope Principals signed the agreement, and, they argue, "the capacity in which they signed is unclear" because "[t]here is no signature block for Scope as an entity." (Docket No. 15 at 6.) This is plainly erroneous on the face of the document. Saldana's signature includes—on a line labeled "title"—the designation "COO", his title at Scope. (Docket No. 1-3 at 32.) Moreover, the "Seller" signature block in which the Scope Principals' signatures appear includes a placeholder, directly above Saldana's signature, that reads "[Insert Business Name]". (*Id.*) Construing the contract as not binding Scope simply because the placeholder was not replaced with the company name would disregard the clear intent of the parties. Perhaps recognizing as much, the defendants concede the issue without explanation in their Reply. (Docket No. 22 at 2 ("Scope is a party to the non-exclusive Servicing Agreement and the non-forum specific Purchase Agreement.").)

UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TENNESSEE . . . ." (*Id*. at 44.) The defendants contend that the Servicing Agreement clause does not confer jurisdiction in Tennessee if litigation is first initiated elsewhere because the clause is non-exclusive. This misreads the clause. While the defendants are correct that the clause does not preclude jurisdiction elsewhere, it unequivocally confers jurisdiction to Tennessee courts should Cal-Tenn choose to invoke that jurisdiction. Cal-Tenn has done just that; the fact that the defendants brought suit first in Texas does not alter Cal-Tenn's rights under the clause.

The defendants next argue that the forum selection clauses confer jurisdiction over Scope and the Scope Principals only for Cal-Tenn's breach of contract claims. They cite *Traton News, LLC v. Traton Corp.*, 528 F. App'x 525 (6th Cir. 2013) for the proposition that "[a] forum selection clause confers personal jurisdiction on a court over only those disputes that the parties agreed to litigate in that forum." *Id*. at 528. The defendants contend that the forum selection clauses constitute agreements only as to claims arising directly from the Purchasing Agreement and Servicing Agreement. In *Traton News*, an unreported decision applying Ohio law, the Sixth Circuit interpreted a forum selection clause as not conferring jurisdiction over the plaintiff's Lanham Act claims. *Id*. The forum selection clause at issue read as follows: "You hereby consent to the exclusive jurisdiction and venue of courts in or nearest to the United States District Court for the Southern District of Ohio, Western Division, in all disputes arising out of or relating to the use of this Web site." *Id*. The Sixth Circuit applied Ohio courts' interpretation of the phrase "arising out of or relating to" and determined that the plaintiffs' Lanham Act claims were not sufficiently related to the website at issue to confer jurisdiction. The Servicing Agreement clause here contains the same "arising out of or related to" language as the clause in *Traton News*, while

the Purchase Agreement clause contains no such limiting language.  The court must look to Tennessee precedent to determine whether the forum selection clauses confer jurisdiction beyond Cal-Tenn's breach of contract claims.

Tennessee courts interpreting forum selection clauses have found jurisdiction for claims arising indirectly from a contractual relationship.  In *Tennsonita (Memphis), Inc. v. Cucos, Inc.*, No. 36, 1991 WL 66993 (Tenn. Ct. App. May 2, 1991), the Tennessee Court of Appeals held that the forum selection clause at issue conferred jurisdiction over claims that did not arise directly from the contracts containing the forum selection clause.  *Id*. at *3.  The forum selection clause was contained in Development and License Agreements and read as follows:

> The parties agree that any action brought by either party against the other in any court, whether federal or state, shall be brought within the State of Louisiana in the judicial district in which Licensor has its principal place of business; and the parties do hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

*Id*. at *2.  The plaintiffs brought claims for breach of contract, misrepresentation, fraud, negligent misrepresentation, and violation of the TCPA, all stemming from the defendants' actions pursuant to an oral agreement that the parties reached after entering the Development and License Agreements.  *Id*.  The trial court dismissed the plaintiffs' claims on the grounds that the forum selection clause barred suit in Tennessee.  *Id*.  The plaintiffs argued on appeal that the forum selection clause did not apply because their claims arose out of the oral agreement, not the Development and License Agreements containing the forum selection clause.  *Id*. at *3.  The appellate court upheld the dismissal on the grounds that the claims arose from the business relationship contemplated by the agreements containing the forum selection clause.  *Id*.  This nexus, the court concluded, was sufficient for the forum selection clause to govern the claims.  *Id*. The court reasoned:

In a case very similar to the case at bar, *Stephens v. Entre Computer Centers, Inc.*, 696 F.Supp. 636 (N.D. Ga. 1988), the forum selection clause was very similar to the clause in this case. In *Stephens* the plaintiffs brought an action in tort as well as in contract and the defendants argued that the tort claims fell outside the scope of the clause. Relying on *Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066 (11th Cir. 1987) (en banc) *affirmed and remanded on other grounds* 487 U.S. 22 (1988), the court found that such clauses cover "all causes of action arising directly or indirectly from the business relationship evidenced by the contract." *Id*. at 1070. Similarly we find that this cause of action arises indirectly from the franchisor-franchisee relationship established by the Development and License Agreements and the forum selection clause contained in those agreements must apply to the [oral] Agreement.

*Id*.

Applying the *Tennsonita* court's logic to this case, it is clear that Cal-Tenn's claims against Scope and the Scope Principals all arise directly or indirectly from the Purchase Agreement and Servicing Agreement. The facts supporting Scope and the Scope Principals' alleged breach of contract, fraud, fraudulent inducement, conversion, interference with a contract, and violation of the TCPA all relate to the parties' handling of the auto loans and underlying collateral that are the subject of the parties' business dealings. The claims therefore emanate from the business relationship established by the Purchase Agreement and Servicing Agreement and, under *Tennsonita*, are subject to the forum selection clauses. As a result, the court has jurisdiction over Scope and the Scope Principals for all of Cal-Tenn's claims against them.[3] The court need not conduct a further minimum contacts analysis as to Scope and the Scope Principals.

## 2. Solis and CAG

Solis and CAG are parties to neither the Purchase Agreement nor the Servicing Agreement. Cal-Tenn alleges that those agreements' forum selection clauses nonetheless confer jurisdiction

---

[3] Because only Scope is a signatory to the Servicing Agreement, Cal-Tenn's claim for breach of contract as related to the Servicing Agreement can only be brought against Scope (and not against the Scope Principals). Additionally, the court notes that Cal-Tenn's claims for fraud and breach of contract are not pled in the alternative. Double recovery will not be available for these claims.

over Solis and CAG under an agency theory of liability because, it contends, Solis and CAG are alter egos of Scope and the Scope Principals. Under Tennessee law, "[t]he laws of the jurisdiction under which a foreign LLC is formed govern . . . the liability of its members and representatives . . . ." Tenn. Code Ann. § 48–249–901. The court will therefore look to Texas law to determine whether Solis and CAG are agents of Scope and the Scope Principals for jurisdictional purposes.

"Texas courts may exercise personal jurisdiction over a nonresident parent corporation if the parent's relationship with its subsidiary that does business in Texas is one that would allow the court to impute the subsidiary's 'doing business' to the parent." *Cappuccitti v. Gulf Indus. Prod., Inc.*, 222 S.W.3d 468, 482 (Tex. App. 2007). Under Texas law, two separate corporations are presumed to be distinct entities, and a corporation is presumed to be separate from its officers and owners. *Id.* Thus, the party seeking to ascribe one corporation's actions to another corporation or individual for jurisdictional purposes by piercing the corporate veil must prove an alter ego relationship. *Id.*; *see also Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship, I, L.P.*, 141 S.W.3d 870, 881 (Tex. App. 2004). To join a company and its purported subsidiary for jurisdictional purposes, a plaintiff "must prove that the parent controls the internal business operations and affairs of the subsidiary." *Cappuccitti*, 222 S.W.3d at 482. The parent's degree of control must be "greater than that normally associated with common ownership and directorship." *Id.* The thrust of the requirement is that the plaintiff "must present evidence showing that the two entities are not separate . . . ." *Id.*

*Cappuccitti*, in which the Texas Court of Appeals held that a subsidiary was the alter ego of its parent company, is instructive. The court found sufficient evidence to pierce the corporate veil where an individual defendant incorporated a parent and subsidiary company on the same day.

*Id.*  The individual defendant incorporated the companies with the understanding that the parent company would loan the subsidiary working capital.  *Id.*  He owned 100% of the shares of the parent company, which owned 90% of the shares of the subsidiary.  *Id.*  He was the sole employee of the parent company and the president (and one of only two employees of) the subsidiary.  *Id.*  He operated both companies from his home.  *Id.*

Cal-Tenn has presented no evidence that Solis and CAG are not separate from Scope and the Scope Principals.  Cal-Tenn argues that Solis and CAG are agents of Scope and the Scope Principals because they performed services on behalf of Scope and because the Scope Principals required that Cal-Tenn work with Solis and CAG.  Cal-Tenn further argues that "Becker relied upon Solis more than the Scope Principals in running Scope and making decisions on Scope's behalf."  (Docket No. 21-10 at 2.)  These allegations do not meet the high bar for piercing the corporate veil under Texas law.  Cal-Tenn does not allege that Scope and CAG have common ownership, were formed by the same principals for the purpose of operating toward a common business goal, or even that they share employees.  Cal-Tenn does not allege that the Scope Principals control the internal business affairs of CAG or that Solis controls the internal business affairs of Scope.  Even read in the light most favorable to Cal-Tenn, the Complaint alleges only that Scope and Cal-Tenn are companies who share a close business partnership and whose managing principals influence each other's business decisions.  That is insufficient to deem the companies alter egos under Texas law.  Because Cal-Tenn fails to demonstrate that CAG and Scope are not separate companies, Solis and CAG are not bound by the forum selection clauses. The court must therefore determine whether Solis and CAG have contacts with Tennessee sufficient to satisfy the minimum contacts necessary for personal jurisdiction.

### B. *Mohasco* **analysis**

The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Cal-Tenn alleges that CAG and Solis are subject to specific jurisdiction. The assertion of specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy," such as an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (internal quotation marks and citations omitted). The court must apply the three-part *Mohasco* test set forth by the Sixth Circuit. *See S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). The *Mohasco* test has three elements, all of which must be met for specific personal jurisdiction to be found:

> (1) "[T]he defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state."

> (2) "[T]he cause of action must arise from the defendant's activities" in or contacts with the forum state.

> (3) "[T]he acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction reasonable."

*Id.*

While all three *Mohasco* elements must be satisfied, purposeful availment is the *sine qua non* of specific personal jurisdiction. *Id.* at 381– 82. The Sixth Circuit has defined purposeful availment as "something akin to a deliberate undertaking to do or cause an act or thing to be done in the forum state or conduct which can be properly regarded as a prime generating cause of the effects resulting in the forum state, something more than a passive availment of the forum state's opportunities." *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472 (6th Cir. 2003). A defendant purposefully avails himself of a forum's protections when his "conduct and

connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* at 479. Purposeful availment "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* The relevant inquiry is "whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Id.* at 480. Put another way, "[t]he question is whether a defendant has followed a course of conduct directed at the society or economy within the jurisdiction of a given sovereign." *J. McIntyre Mach. v. Nicastro*, 564 U.S. 873, 884 (2011).

In Cal-Tenn's Response, its argument for purposeful availment focuses on Scope and the Scope Principals, mentioning Solis and CAG only in passing. The crux of Cal-Tenn's argument is that Solis and CAG took actions that impacted Cal-Tenn in Tennessee. Cal-Tenn alleges the following facts in support:

> Certain of the vehicles that formed security for funding the Scope receivables under the parties' Dealer Master Purchase Agreement are now located in Tennessee.
>
> Scope employees, Edgar Solis, and Care Auto Group assisted with and helped coordinate the transportation of some of these vehicles to Tennessee on Scope's behalf.
>
> Solis and Care Auto Group performed collection activities, handled repossessions, reconditioned Scope vehicles, took vehicles to auction, floor planned (financed) vehicles, and generally did what William Becker . . . or Scope asked to be done for Scope.
>
> Becker demanded that Cal-Tenn work with Solis and use Solis to collect on the loans and Becker gave Solis access to Scope like he was an employee.
>
> . . .
>
> Solis disposed of repossessed vehicles at auction without Cal-Tenn's knowledge or permission.

(Docket No. 21-10 at 1–3 (Affidavit of Tracy McMurtry).)

The Sixth Circuit has considered the limits of purposeful availment at length, notably in *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000). In *Calphalon*, the defendant corporation served in certain states as the exclusive sales representative of the plaintiff, an Ohio-based cookware manufacturer. The defendant's four-state territory did not include Ohio but, after a contract dispute arose, the plaintiff sued the defendant in Ohio. The Sixth Circuit found jurisdiction lacking. It held that the defendant's contacts with Ohio were purely "fortuitous" and "attenuated" because the defendant was not working for the plaintiff in Ohio. *Id*. at 722. Moreover, the defendant's contacts with Ohio "occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendant] sought to further its business and create 'continuous and substantial' consequences there." *Id*. The court summarized the relevant precedent and considerations for purposeful availment as follows:

> In *Kerry Steel Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 151 (6th Cir. 1997), we held that an out-of-state defendant-buyer did not purposefully avail itself of the benefits and protections of the forum state's laws because, in part, no facts connected the subject matter or performance of the contract at issue to the forum state. Furthermore, we held that any negative economic effect on the in-state plaintiff-seller did not create a determinative impact on the state economy, as "'the locus of such a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in the forum state.'" Likewise, in *International Technologies Consultants v. Euroglas,* 107 F.3d 386, 395 (6th Cir. 1997), we found it "purely fortuitous" that the foreign defendant-seller had any contact with Michigan. The defendant was not attempting to "exploit any market for its products" in the state of Michigan, but rather had contact with the state only because the plaintiff chose to reside there. These contacts differ from the defendant's efforts in *Lanier v. American Board of Endodontics*, 843 F.2d 901 (6th Cir. 1988), which we held to demonstrate purposeful availment. In *Lanier*, 843 F.2d at 911, the foreign medical certification board sought to associate with the in-state plaintiff to further its business and create "continuous and substantial" consequences in the state.

*Id*. at 722–23 (internal citations omitted).

Applying these principles, the court finds that Solis and CAG have not purposefully availed themselves of the benefits and privileges of Tennessee. Solis and CAG cannot reasonably have anticipated being haled into court in Tennessee for work done on behalf of Texas entities in Texas. Solis and CAG's contacts with Tennessee occurred solely because Cal-Tenn chooses to be headquartered here. They have not entered into any contractual relationships with any Tennessee companies, including Cal-Tenn. They have not sought to create continuous and substantial contacts with Tennessee; indeed, Cal-Tenn does not allege any Tennessee contacts beyond Solis and CAG's dealings with Cal-Tenn. Cal-Tenn's economic injuries in Tennessee did not result from any privilege exercised by Solis and CAG in Tennessee. Because Solis and CAG's contacts with Tennessee are entirely fortuitous, Solis and CAG have not purposefully availed themselves of Tennessee's benefits and protections.

Even if Cal-Tenn could successfully show purposeful availment, it could not satisfy the second *Mohasco* element: that Cal-Tenn's causes of action arise from the defendants' Tennessee contacts. The "arising from" prong is met "if a defendant's contacts with the forum state are related to the operative facts of the controversy." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact." *Calphalon Corp.*, 228 F.3d at 723–24. To satisfy this prong, "the plaintiff must demonstrate a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 506–07 (6th Cir. 2014). The prong "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'" *Third*

*Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (quoting *Mohasco*, 401 F.2d at 384 n.27)). The guiding principle for district courts is to "look to where the operative facts of the controversy arose." *Calphalon Corp.*, 228 F.3d at 724.

Cal-Tenn's causes of action against Solis and CAG arise from conduct that did not take place in Tennessee. Cal-Tenn's claims arise exclusively out of conduct by Solis and CAG in Texas. Solis and CAG allegedly interfered in Texas with Cal-Tenn's contractual relationships with Texas companies. Solis and CAG disposed of repossessed vehicles in Texas. No actions undertaken by Solis or CAG in Tennessee contributed to the factual allegations underlying Cal-Tenn's claims. This is clearly distinguishable from cases where operative facts arose from a defendant's activities in the forum state. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 892 (6th Cir. 2002) (finding the "arising from" requirement of *Mohasco* satisfied where the defendant's activities in the forum state caused the plaintiff's economic injury); *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 909 (6th Cir. 1988) ("Clearly the cause of action herein, if one exists, arose from, was 'made possible' by, and lies in the 'wake' of the application process, much of which occurred in [the forum state]."). Even under the lenient standard of the second *Mohasco* prong, Cal-Tenn cannot show that its causes of action arise out of contact that Solis and CAG had with Tennessee.

Dismissal for lack of personal jurisdiction is "proper if all of the specific facts . . . alleged collectively fail[ ] to state a prima facie case for jurisdiction under the appropriate standards." *Theunissen*, 935 F.2d at 1459. Cal-Tenn cannot show that Solis and CAG are bound by the forum selection clauses or that they have sufficient minimum contacts with Tennessee to be subject to jurisdiction here. Because Cal-Tenn cannot meet its burden of demonstrating that an exercise of

jurisdiction over Solis and CAG is appropriate, the court will dismiss Cal-Tenn's claims against them.

## II. *Colorado River* abstention

The defendants also argue that this case should be dismissed pursuant to the *Colorado River* abstention doctrine due to the prior pending state court lawsuit. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976). The Supreme Court has explained that, despite the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous, or "parallel," exercise of jurisdiction by state and federal courts. *Id.* The Sixth Circuit has stressed that the "principles underlying this doctrine 'rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (quoting *Colorado River*, 424 U.S. at 817); *Good v. S. Steel & Constr., LLC*, No. 3:17-CV-1143, 2018 WL 2986844, at *1 (M.D. Tenn. June 14, 2018) (Campbell, J.) (same).

The *Colorado River* analysis is composed of two parts: first, the court must determine that the concurrent state and federal actions are actually parallel; and second, the court must weigh several factors identified by the Supreme Court in *Colorado River*. *Romine*, 160 F.3d at 339. "Exact parallelism" is not required; it is enough if the two proceedings are substantially similar. *Id.* (citing *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)). The Supreme Court has explained that a stay should only be granted where it would allow for a "quick and prompt resolution between the parties," such that the federal court "will have nothing further to do in

resolving any substantive part of the case, whether it stays or dismisses." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 23–26 (1983) (emphasis added).

For the cases to be considered parallel, "substantially the same parties must be contemporaneously litigating substantially the same issues," and "the critical question is whether there is a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *Capitol Wholesale Fence Co*., 2014 WL 7336236 at *3 (emphasis added) (quoting *Huon v. Johnson & Bell, Ltd*., 657 F.3d 641, 646 (7th Cir. 2011)). "If there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues before the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation." *Chellman–Shelton v. Glenn*, 197 F. App'x. 392, 394 (6th Cir. 2006). In providing further guidance to district courts, the Sixth Circuit has stated that, "in deciding whether a state action is parallel for abstention purposes, the district court must compare the issues in the federal action to the issues *actually raised* in the state court action." *Baskin v. Bath Tp. Bd. of Zoning Appeals*, 15 F.3d 569, 572 (6th Cir. 1994)) (emphasis added); *NCO Acquisition, LLC v. Snyder,* No. 12-10122, 2012 WL 2072668, at *4 (E.D. Mich. June 8, 2012). Likewise, as an exemplar, in *Crawley v. Hamilton Cty. Commissioners*, 744 F.2d 28 (6th Cir. 1984), the court stressed, among other reasons for declining to apply *Colorado River* abstention, that there were claims in the federal suit not present in the state suit. Put simply, where there are issues raised in the federal suit that will not be resolved by the state suit, *Colorado River* abstention is inappropriate. *Id*.; *see also D J Drilling & Blasting, Inc. v. Flanagan Contracting, LLC*, No. 3:15-CV-00678, 2016 WL 10651097, at *2 (M.D. Tenn. Jan. 28, 2016) (Nixon, J.) ("If a state court action and a federal action are truly parallel, resolution of the state court action will

also resolve all issues in the federal action.") (quoting *Wright v. Linebarger Googan Blair & Sampson*, *LLP*, 782 F. Supp. 2d 593, 603 (W.D. Tenn. 2011)).

There are not parallel proceedings between the defendants and Cal-Tenn. The Texas suit includes Scope and the Scope Principals' claims, as plaintiffs, against Cal-Tenn. This suit involves the converse. Although the cases involve essentially many of the same causes of action, they involve different issues and different proofs because they are brought by opposite parties. In other words, while the Texas suit would resolve whether Cal-Tenn fraudulently misled Scope, it might not resolve whether Scope also fraudulently misled Cal-Tenn. That Cal-Tenn could have brought its claims in the Texas case is irrelevant because the court must compare only the issues actually raised in the underlying litigation. *See See AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 522 (7th Cir. 2001) ("[T]he appellees point to no authority (nor have we found any) suggesting that a federal action is parallel to a state or foreign action for *Colorado River* abstention purposes when the claim upon which the federal action is based is pleadable as a compulsory counterclaim in the other action."); *see also AMEX Assur. Co. v. Giordano*, 925 F. Supp. 2d 733, 739 (D. Md. 2013) ("[T]he Court rejects Giordano's argument that AMEX's federal claims constitute nothing more than defenses or counterclaims that should be raised in Illinois, thereby rendering the state and federal actions parallel. Instead, the Court evaluates the proceedings as they currently exist and concludes that the issues are not substantially the same."). Even if adjudication of the claims in the Texas suit might resolve some of the issues in this case—for example, by finding that Scope was not guilty of a first material breach of the Purchase Agreement or Servicing Agreement— other issues, such as Cal-Tenn's TCPA claim, could not be resolved in the Texas suit because they are not before the Texas court. Given the strong presumption in favor of federal courts exercising the jurisdiction granted them by Congress, abstention is not warranted under these circumstances.

## **CONCLUSION**

For the foregoing reasons, the defendants' motion will be granted in part. Cal-Tenn's claims against Solis and CAG will be dismissed for lack of jurisdiction. Its claims against Scope and the Scope Principals will not be dismissed at this time.

A separate Order will enter.

ENTER this 20th day of March 2019.

_____
ALETA A. TRAUGER
United States District Judge